# IN THE COURT OF APPEALS OF IOWA

No. 13-1635
Filed July 30, 2014

**IN RE THE ESTATE OF**
**MORISON JUNIOR ELLIS,**
**Deceased**

**MORISON EDDY ELLIS,**
        Intervenor-Appellant.
_____

**IN RE THE ESTATE OF**
**NORMA JEAN ELLIS,**
**Deceased**

**MORISON EDDY ELLIS,**
        Intervenor-Appellant.
_____

        Appeal from the Iowa District Court for Calhoun County, Kurt L. Wilke,

Judge.

        A beneficiary appeals from a district court order construing the decedents'

wills. **AFFIRMED.**

        James L. Kramer of Johnson, Kramer, Good, Mulholland, Cochrane &

Driscoll, P.L.C., Fort Dodge, for appellant.

        Gary W. Armstrong of Mack, Hansen, Gadd, Armstrong & Brown, P.C.,

Storm Lake, for appellee.

        Considered by Vogel, P.J., and Doyle and Mullins, JJ.

**MULLINS, J.**

Morison Eddy Ellis (Eddy) appeals from the district court order regarding a petition for construction of the wills of his late parents, Morison Junior Ellis (Junior) and Norma Jean Ellis (Norma), collectively the Ellises. The district court found the wills' terms providing for the devise of the Ellis's farmland between their three children were ambiguous, and judicially construed each will such that the quantity terms prevailed over the legal descriptions. Eddy appeals, arguing that the legal descriptions of the devises should prevail. The district correctly found the terms of the wills were ambiguous and the testamentary intent was to divide the property according to the quantitative terms. We affirm.

## I. Background Facts & Proceedings.

Junior and Norma, as tenants in common, owned a farm consisting of several separate parcels comprising 638.71 acres in Calhoun County. In the spring of 2012, they approached attorney Gordon Madson about writing their wills. Each will bequeathed to the surviving spouse a life estate in the deceased spouse's undivided one-half interest in the estate. The wills divided the remainder interest between the Ellis's three children, Morison Eddy Ellis (Eddy), Rebecca Jean Haberl, and Steven Dennis Ellis.

Each will provided the following devises to Eddy:

The Southwest Quarter (1/4 SW) of Section Eight (8), Township Eighty-eight (88) North, Range Thirty-three (33) West of the 5th P.M., Calhoun County, Iowa, *containing 141.4 acres, more or less.*

The North Half (N 1/2) of the Southeast Quarter (SE 1/4) and the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4) of Section Eighteen (18), Township Eighty-eight (88) North, Range

Thirty-three (33) West of the 5th P.M., Calhoun County, Iowa, *containing 68 acres, more or less.*

Each will provided the following devises to Rebecca:

The South Half (S 1/2) of the South Half (S 1/2) of the Northeast Quarter (NE 1/4), and the South Half (S 1/2) of Southeast Quarter (SE 1/4) of the Northwest Quarter (NW 1/4) of Section Eighteen (18), Township Eighty-eight (88) North, Range Thirty-three (33) West of the 5th P.M., Calhoun County, Iowa *containing 112 acres, more or less.*

Lot 9 and 10 in Section Five (5), Township Eighty-eight (88) North, Range Thirty-three (33) West of the 5th P.M., Calhoun County, Iowa *containing 100 acres, more or less.*

Finally, each will provided the following devise to Steven:

The Southwest Quarter (SW 1/4) and all that part of the South Half of Section Five (5), lying West of Drainage Ditch No. 6, all in Section Five (5), Township Eighty-eight (88) North, Range Thirty-three (33) West of the 5th P.M., Calhoun County, Iowa *containing 210 acres, more or less.*

(Emphasis added.) Thus, the wills provided both a quantity term for each devise, totaling about 210 acres for each child, and legal descriptions of the particular parcels. The wills also divided the Ellises' personal property, stock, and dividends equally between the children.

Junior and Norma passed away in the fall of 2012, within twelve days of each other. Their wills were admitted to probate. Upon review, the executor[1] determined that the quantitative terms listed in each devise did not match the legal descriptions of the parcels. Applying the quantitative terms would result in each child receiving around 210 acres: Eddy 209.4 acres, Rebecca 210 acres,

---

[1] The court originally appointed Eddy and Steven as co-executors of the estate; however, upon perceiving the present controversy, they resigned, and the court appointed the bank as executor.

and Steven 212 acres. Applying the legal descriptions of the parcels would result in Eddy receiving 259.71 acres,[2] Rebecca receiving 140 acres,[3] and Steven receiving 239 acres.[4]

The estate filed a petition for construction asking the court to construe and interpret the wills and adjudicate the devisees' interests. The court determined the wills were ambiguous and admitted extrinsic evidence including the Ellises' handwritten notes and the drafting attorney's testimony. The court determined that the Ellises' intent was the devises should be consistent with the quantitative terms, not necessarily conform to the legal description. It ordered that the number of acres listed in the wills should prevail over the legal descriptions. Eddy appeals from this decision.

## II. Standard of Review.

On a petition for construction of a will, our review is de novo. *In re Estate of Williams*, 515 N.W.2d 552, 553 (Iowa Ct. App. 1994).

## III. Analysis.

### A. Legal description vs. recited quantity.

In order to determine whether the quantitative terms or the legal descriptions prevail, we first address Eddy's argument that the trial court failed to follow the rule set out in *Ufford v. Wilkin*, 33 Iowa 110, 112 (Iowa 1871), that if any discrepancy arises between a quantitative term and a legal description, the legal description must prevail and the quantitative term must be disregarded. In

---

[2] 259.71 acres is 24% more acres than 209.4 acres.
[3] 140 acres is 33% fewer acres than 210 acres.
[4] 239 acres is 13% more acres than 212 acres.

*Ufford,* the legal description in the deed recited "the land conveyed as 'being forty acres.'" *Ufford*, 33 Iowa at 111. The property conveyed was actually forty-four acres.[5] *Id.* at 111. The supreme court explained: "The rule is that when the *quantity* of land is mentioned in a deed as part of the description, it will be rejected if it be inconsistent with the actual area of the premises as ascertained by known monuments or other description[.]" *Id.* at 112. The estate argues the *Ufford* rule is for land conveyances through deeds and is not applicable when construing wills because testator intent is the primary consideration. It argues that our supreme court, in *Westcott v. Meeker*, 122 N.W. 964, 968 (Iowa 1909), determined that the testator's intent prevails over a conflicting rule of property conveyance.

"The sole justification and the only purpose of a judicial construction of a will is the development of the intent of the testator." *Guilford v. Gardner*, 162 N.W. 261, 266 (Iowa 1917). "[T]he intent of the testator is the polestar and must prevail." *In re Estate of Roethler*, 801 N.W.2d 833, 842 (Iowa 2011). It is for this reason our supreme court found in *Westcott* that, "wills are to be construed more liberally than deeds." *Westcott*, 122 N.W. at 968.

> A few combinations of words have become so fixed in their meaning by long and unvarying use as to be rules of property. But ordinary canons for the interpretation of wills, having been established only as aids for determining testamentary intent, are to be followed only so far as they accomplish that purpose, and not when the result would be to defeat it.

---

[5] Forty-four acres is 10% more acres than forty acres.

*Id.* (quoting *Ware v. Minot*, 88 N.E. 1091, 1091 (Mass. 1909)). Indeed, when testamentary intent does not violate established rules of law, "arbitrary and technical rules of construction cannot defeat it." *Dickerson v. Morse*, 202 N.W. 601, 604 (Iowa 1925).

Eddy contends the *Ufford* rule applies equally to deeds and wills and argues there is no case limiting the *Ufford* rule to deeds. However, *Ufford* limits itself by its own language to "when the *quantity* of land is mentioned in a deed." *Ufford*, 33 Iowa at 112. We find no Iowa case in which the *Ufford* rule was applied to the construction of a will, let alone to supersede testamentary intent. Eddy cites several Iowa cases applying the rule, none of which involve construction of a will.

Even if the *Ufford* decision concerning deeds were applicable to wills, its principle must be considered in light of a line of cases subsequent to *Ufford* that distinguish when a quantity reference in a legal description will be regarded as more than merely descriptive. For example, in *Prenosil v. Pelton*, 173 N.W. 235 (Iowa 1919), the deed conveying real estate contained a legal description and a recitation "containing in all one hundred eighty-one and 10/100 acres more or less." In fact, only 150 acres were conveyed by the legal description.[6] *Prenosil*, 173 N.W. at 235-36. In an action for breach of warranty and for damages for the discrepancy, the court determined "as a matter of law that a shortage of more than 30 acres in land conveyed as containing 181 acres is not such 'slight variation' or 'reasonable deficiency' or 'near approximation' as may be presumed

---

[6] One hundred fifty acres is approximately 17% fewer acres than 181.1 acres.

to have been contemplated by the parties in the use of the words 'more or less,' and that in the absence of some other defense, the plaintiffs will be entitled to relief." *Id.* at 237. In reaching this conclusion, the court stated: "It may be conceded to be the general rule that, where a vendee buys land with reference to described boundaries or to government survey, the added statement of acreage is regarded as merely descriptive, *unless the discrepancy is so great as to reasonably excite suspicion of fraud or mistake.*" *Id.* (emphasis added).

In the case of *Mahrt v. Mann,* 210 N.W. 566, 566 (Iowa 1926), our supreme court was deciding an action in equity by a vendee seeking to recover from his vendor for a shortage in quantity of land. The written real estate contract recited a legal description "containing 150.46 acres, according to the United States government survey, be the same more or less." *Mahrt*, 210 N.W. at 566. A subsequent survey revealed the tract contained only 124.9 acres.[7] *Id.* Citing *Prenosil* and earlier cases, the court found the conveyance included a warranty that the actual quantity of land "is near approximate to that [quantity] mentioned." *Id.* at 567. Because the variance in the acres was substantial, the vendee was entitled to relief so that he would only pay for the actual acres conveyed. *Id.* at 567-68.

### B. Is the will ambiguous?

Principles of will construction are well-established. Intent must be derived from: "(a) all of the language contained within the four corners of the will, (b) the scheme of distribution, (c) the surrounding circumstances at the time of the will's

---

[7] One hundred twenty-four and nine-tenths acres is approximately 17% fewer acres than 150.46 acres.

execution and (d) the existing facts[.]" *Roethler*, 801 N.W.2d at 842 (citing *In re Estate of Rogers*, 473 N.W.2d 36, 39 (Iowa 1991)). "In determining intent, the question is not what the testator meant to say, but rather what is the meaning of what the testator did say." *Id.* "The instrument should be considered as a whole, giving each part meaning and effect." *Id.* "[W]e resort to technical rules or canons of construction only when the will is ambiguous or conflicting or the testator's intent is uncertain." *Id.* "When the terms of a will are clear, plain, and unambiguous, reference to extrinsic material facts is not allowed." *In re Estate of Redenius*, 455 N.W.2d 295, 298 (Iowa Ct. App. 1990). "Before extrinsic evidence may be admitted to show a testator's intent, a patent or latent ambiguity must be shown." *Id.* Patent ambiguity "appears on the face of the will and arises from the phraseology or the defective, obscure, doubtful or uncertain language" of the instrument. *In re Estate of Lepley*, 17 N.W.2d 526, 529 (Iowa 1945). Latent ambiguity "exists where the language of the instrument does not lack certainty but some extrinsic or collateral matter outside the will renders the meaning obscure and uncertain." *Id.* When there is an ambiguity, extrinsic evidence is admitted to determine the testator's intent but it "cannot vary, contradict, or add to the will's terms." *Roethler*, 802 N.W.2d at 842-43*.*

Eddy contends the will is not ambiguous and the Ellis's intent can be determined from the language alone, meaning there is no need to resort to extrinsic evidence. He bases his argument on the *Ufford* rule, asserting there is no ambiguity when the quantitative terms are disregarded. The estate contends there are both latent and patent ambiguities in the will.

The first ambiguity appears in the first real estate description shown in the will seeking to devise to Eddy "[t]he Southwest Quarter (1/4 SW) . . . *containing 141.4 acres, more or less."* Those words in the will make it uncertain whether the testators intended to devise a quarter section of land, being 160 acres, or some lesser tract containing 141.4 acres. The second tract devised to Eddy describes 120 acres, and says "containing 68 acres more or less."[8] Thus, without reviewing any additional property descriptions, on the face of the will, the language used leaves doubt and uncertainty as to what land or how much land should be distributed. Thus a patent ambiguity exists.[9] In order to administer the estate, it was necessary for the executor either to distribute the land as legally described or to distribute the number of acres set forth to each devisee. The meanings of the devises was obscure and uncertain, as it was not possible to satisfy distribution of both the legally described real estate and the acres described. The trial court correctly found the devises were ambiguous. Consequently, we will consider extrinsic evidence to determine the Ellises' intent.

## C. Did the district court correctly resolve the ambiguity?

Attorney Gordon Madson testified he had done legal work for the Ellises for around twelve years. They approached him to write their wills and had an initial meeting with him in spring 2012. Madson testified the Ellises brought with them to the meeting two pages of notes, in Junior's handwriting, of their

---

[8] These two descriptions appear on their face to total 280 acres, while the wills state their quantities total 209.4. The fact that the tracts ultimately totaled 259.71 acres—see footnote 2—does not detract from our finding patent ambiguities on the faces of the wills.
[9] When a court is unable to ascertain from the contents of the language actually used what property the parties intended to transfer, a patent ambiguity exists. *See* 23 Am. Jur. 2d Deeds § 263 (2014).

directions for the wills. They also brought a diagram, also in Junior's handwriting, of the various parcels of land and how they wanted them to be divided. The labels on the diagram matched the descriptions in the notes.

The diagram depicts three plots of land, labeled sections five, eight, and eighteen. The section-five plot is labeled "309 acre farm" and is divided into two parcels. The upper parcel is labeled "100 acres to Becky[.]" The lower parcel is labeled "210 acres to Steve Ellis[.]" The section-eight plot is labeled "all to Eddy Ellis 141.4 acre farm[.]" The section-eighteen plot is divided into two parcels. The upper parcel is labeled "68 acres to Eddy Ellis[.]" The lower parcel is labeled "112 acres to Becky[.]"

Madson completed a draft of the wills according to these directions[10] and sent a copy to the Ellises along with a letter instructing them, "You should both read your Will over very carefully, making sure that the real estate as shown is the way you want your farm real estate distributed." The first draft of the wills contained the legal descriptions, but did not include the quantities. Shortly after sending the draft, Junior called Madson's office and spoke to Madson's secretary, Shirley Williams. Williams testified Junior wanted the number of acres written into the will. She asked him which numbers. Junior indicated that she should take the numbers from the notes and diagram he had provided. Williams reviewed the numbers with Junior, approved the changes with Madson, and

---

[10] Madson's secretary, Shirley Williams, who typed the will from his dictation, testified the legal descriptions were taken from abstracts and deeds, some of which Madson had prepared for prior transactions.

typed them into the will. The next day, the Ellises came to the law office and signed the will.

If the quantitative terms are followed, the devises contemplated are nearly equal between the three children, with each child receiving about 210 acres. This distribution is consistent with the other bequests in the Ellises' will which also dispose of their other property equally. The Ellises' tools and vehicles were to be sold at auction and the proceeds distributed to the three children "in equal shares, share and share alike." The same distribution was to be made of the Ellises' stocks and dividends. The Ellises' particular concern that the acreage be included in the wills indicates those terms were important as an expression of their intentions as to the disposition of their property. Junior's labeling of the various parcels indicates he himself was unaware of their true legal descriptions.

If the real estate descriptions were followed, as Eddy urges, the acreage distributions would vary from the recited acres as follows: Eddy would receive 24% more than 210 acres, Rebecca would receive 33% less, and Steven would receive 13% more.[11] The *Ufford* case approved a 10% variance. The court in *Prenosil* and *Mahrt* rejected variances of 17%. With respect to two out of three of the devises in the present case, the variances would greatly exceed the variances rejected in *Prenosil* and *Mahrt*. We find such deficiencies in this case are not "slight variations," "reasonable deficiencies," or "near approximations." See *Prenosil*, 173 N.W. at 237. Accordingly, *Ufford* does not control.

---

[11] Eddy argues the inclusion of the term "more or less" after the quantity term in each devise indicates the Ellises did not intend the distribution to be precisely equal. We find, although the phrase allows for some variance, it cannot account for the extent of variance in this case.

The distribution of the personal property, the circumstances around the writing of the wills, and the Ellises' apparent misapprehension as to the discrepancies between the legal descriptions inserted by their lawyer and the acreages which they wanted to devise lead us to conclude the Ellises' intent in devising their farmland was to distribute it nearly equally between their children. Thus, the quantitative terms, which more closely approximate the intended result, must prevail, and we affirm the district court's resolution of the ambiguity.

## IV.  Conclusion.

We conclude the *Ufford* rule is not controlling as to the acreage discrepancy in this case.  Applying traditional and long-standing rules of will construction, we find the wills have ambiguities regarding disposition of the real estate.  After examining the language of the wills and the extrinsic evidence in the case, we conclude the Ellises intended the quantitative terms to define their devises.  Consequently, the quantitative terms in the devises prevail over the legal descriptions.  Therefore, we affirm the district court order.

**AFFIRMED.**